# UNITED STATES DISTRICT COURT

NORTHERN         DISTRICT OF   ILLINOIS, EASTERN DIVISION

UNITED STATES OF AMERICA

v.

**FILED**

J.N

MAR 1 8 2008

3-18-08

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

**CRIMINAL COMPLAINT**

HAROLD PERKINS, aka "PK,"
ROBERTO DURAN, aka "Jose" and "Berto,"
WALLACE BUTCHER, and
DAVID MALDONADO

CASE NUMBER:

**08CR   223**

**MAGISTRATE JUDGE KEYS**

I, the undersigned complainant being duly sworn state the following is true and correct to the best of my knowledge and belief.  Beginning in or about January 2006 and continuing through the present, in Cook County, in the Northern District of Illinois, defendant(s)

did conspire with each other and others to knowingly and intentionally distribute and possess with the intent to distribute controlled substances, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine and in excess of 500 grams of mixtures containing cocaine, Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1);

in violation of Title  21 , United States Code, Section  846.

I further state that I am a Special Agent for the Federal Bureau of Investigation and that this complaint is based on the following facts:

**See attached affidavit**

Continued on the attached sheet and made a part hereof:    **X**  Yes ___ No

_____
Signature of Complainant

Sworn to before me and subscribed in my presence,

March 18, 2008_____        at     Chicago, Illinois_____
**Date**                                      **City and State**

MAGISTRATE JUDGE ARLANDER KEYS_____      _____
**Name & Title of Judicial Officer**              **Signature of Judicial Officer**

STATE OF ILLINOIS            )
                             )    SS
COUNTY OF COOK               )

## AFFIDAVIT

I, Jason Rahoy, Special Agent of the Federal Bureau of Investigation, United States Department of Justice, having been duly sworn under oath, state as follows:

## I.    INTRODUCTION

1.    I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since July 2006, and am presently assigned to the FBI's Joint Task Force on Gangs, Chicago Field Division. As part of my official duties, I investigate criminal violations of the federal narcotics laws, including, but not limited to, Title 21, United States Code, Sections 841 and 846. I have received special training in the enforcement of laws concerning controlled substances. I am familiar with and have participated in all of the normal methods of investigation including, but not limited to, search warrants, visual surveillance, electronic surveillance, the debriefing of defendants, witnesses, informants, and others who have knowledge of the distribution of controlled substances, as well as the use of informants. Based on my training and experience, I am familiar with the ways in which drug traffickers conduct their drug-related business, including, but not limited to, their methods of distributing narcotics, their use of telephones, and their use of code words to identify themselves and the nature of their communications.

1

2.    The statements contained in this Affidavit are based in part on: (a) my personal participation in this investigation; (b) information provided by other federal, state, and local law enforcement officers; (c) information provided by cooperating witnesses who have proven reliable and provided information which has been independently corroborated, as set forth in part, herein; (d) analyses of pen register and trap and trace data; (e) review of consensually-recorded conversations and conversations intercepted pursuant to court orders; (f) my training and experience and the training and experience of other law enforcement agents; (g) laboratory analysis reports; (h) intelligence reports of telephone record, pen register, and trap and trace analyses; (i) audiotapes of consensually-recorded conversations; and (j) criminal history records maintained by the Chicago Police Department ("CPD"), Illinois State Police ("ISP"), and the National Crime Information Center ("NCIC").

3.    This Affidavit is being submitted in support of a criminal complaint charging that beginning in or about January 2006 and continuing to the present, the below-listed individuals conspired with each other and others to knowingly and intentionally distribute and possess with the intent to distribute controlled substances, namely, in excess of 50 grams of mixtures containing cocaine base in the form of crack cocaine and in excess of 500 grams of mixtures cocaine, Schedule II Narcotic Drug Controlled Substances, in violation of Title 21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code, Section 846:

      a.    HAROLD PERKINS, also known as ("aka") "PK," aka "P";
      b.    ROBERTO DURAN, aka "JOSE," aka "BERTO," aka "B";

    c.      WALLACE BUTCHER, aka "WALLY," aka "JASON"; and

    d.      DAVID MALDONADO.

## II.    BACKGROUND OF INVESTIGATION

### A.    The Cooperating Witness

4.    The cooperating witness ("CW1")[1] has been providing reliable, timely information to the FBI since approximately June 2005. During this time, FBI Agents have spoken to CW1 in person, or telephonically, on numerous occasions. A substantial portion of CW1's information has been corroborated by independent investigation that includes physical surveillance, witness interviews, telephone record analysis, consensually monitored telephone and in-person conversations, controlled narcotics purchases, and court-authorized interceptions of wire communications.

5.    As late as 2004, CW-1 knew PERKINS to sell cocaine from his automobile, on the street, or from inside HEAD TO TOE. PERKINS owns the HEAD TO TOE TATTOO SHOP (hereinafter referred to as "HEAD TO TOE"), located at 5005 North Clark Street, Chicago, Illinois. CW-1 knew PERKINS to deal in guns and keep guns in the cabinets with the tattoo and piercing instruments in each of the private booths in HEAD TO

---

[1]CW-1 has provided reliable information corroborated by, among other means, consensually-recorded calls with an investigative target, cocaine purchases conducted by CW-1, and physical surveillance. CW-1 has prior convictions for violation of a protection order and telephone harassment. CW-1 is actively cooperating with law enforcement in hopes of receiving assistance in joining the United States military. CW-1 has been advised that it is unlikely that the FBI will be able to provide this type of assistance. CW-1 is not being paid by the FBI for CW-1's cooperation with this investigation. On one occasion, while assisting with an unrelated investigation, CW-1 denied his/her presence at the location and time of criminal activity despite evidence to the contrary. When questioned, CW-1 denied any intent to deceive agents regarding his/her presence.

TOE.

6.      On November 16, 2005, CW-1 positively identified PERKINS from a CPD booking photograph.

7.      On June 8, 2006, CW-1 positively identified DURAN from a CPD booking photograph.

### B.    The Wiretap Investigation

8.      On June 30, 2006, Chief Judge Charles P. Kocoras signed an order authorizing the interception of wire communications to and from (773) 454-9364 ("Target Phone 1"), a phone subscribed to PLATINUM TELEPHONE, and used by ROBERTO DURAN. Interception began on June 30, 2006 and continued through July 29, 2006.

9.      On August 24, 2006, Chief Judge Charles P. Kocoras signed an order authorizing the interception of wire communications to and from (773) 209-3910 ("Target Phone 2"), a phone subscribed to PLATINUM TELEPHONE, and used by HAROLD PERKINS.   Interception began on August 24, 2006 and continued through September 22, 2006.[2]

---

[2]At various points in this Affidavit, I have placed in parentheses my understanding of what was being said during consensually recorded and intercepted conversations.  My understanding is based on the contents and context of the conversations, my experience as a law enforcement officer, statements made to me or other law enforcement officers by cooperating witnesses, the experience of other law enforcement agents and officers in this investigation, and the evidence gathered to date in the investigation.  The times listed for these calls are approximate.  Finally, the summaries below do not include all potentially criminal calls intercepted during the period of interception, or all statements or topics covered during the course of intercepted conversations.  To the extent quotations are included, they are based on preliminary and not final transcripts, and may not represent the entire conversation that occurred between the identified individuals.  Some calls contained Spanish language and the calls were summarized by Spanish-speaking agents.

### III.    SUMMARY OF PROBABLE CAUSE

10.    This investigation revealed that HAROLD PERKINS is the leader of a drug trafficking organization ('the organization") that is responsible for the distribution and delivery of large quantities of crack cocaine, powder cocaine and marijuana to multiple customers throughout the Chicago metropolitan area and elsewhere. ROBERTO DURAN and WALLACE BUTCHER are principal cocaine distributors for the organization, and were supplied cocaine, marijuana, and other illegal narcotics by PERKINS. PERKINS has also provided instructions to DURAN and BUTCHER regarding the distribution of cocaine.

11.    DAVID MALDONADO regularly purchased wholesale quantities of cocaine from the organization for re-sale to others.

12.    PERKINS has used an apartment at 1211 West Jarvis, Chicago, Illinois, as a location for storage and processing of cocaine. PERKINS has also used his businesses, HEAD TO TOE, 5005 North Clark Street, and WAYNE'S WORLD SPY SHOP / HEAD TO TOE RECORDING STUDIO, 4653 North Clark Street, as locations from which individuals would collect United States currency derived from the sale of narcotics by the organization ("narcotics proceeds"). Those locations were also used to pay cocaine suppliers.

13.    On September 11, 2006, as detailed below, PERKINS told BUTCHER to process as much cocaine as he would need and to clean everything out of the apartment at 1211 West Jarvis. Surveillance of BUTCHER in the vicinity of 1211 West Jarvis led to a seizure of 353.5 grams of crack cocaine, 481 grams of powder cocaine, and three handguns

with ammunition. At PERKINS's direction, BUTCHER fled the Chicago area to Kentucky and then Florida in response to the seizure.

## IV.    SUMMARY OF DEFENDANTS' ROLES IN THE CONSPIRACY

14.    The following is a brief summary of the roles of each proposed defendant:

a.    **HAROLD PERKINS**: is the leader of the organization described herein.

b.    **ROBERTO DURAN**: is a high level distributor of crack cocaine, powder cocaine, and marijuana for the organization.

c.    **WALLACE BUTCHER**: is a high level distributor of crack cocaine, powder cocaine, and marijuana for the organization.

d.    **DAVID MALDONADO**: is a distributor of narcotics for the organization.

## V.    PROBABLE CAUSE

### A.    Controlled Purchases of Narcotics from PERKINS, DURAN and BUTCHER.

#### February 8, 2006 Controlled Purchase from PERKINS

15.    On February 8, 2006, at approximately 2:40 p.m., CW1 telephonically notified me that he/she had received a call from PERKINS.[3]  CW1 related to me that CW1 told

---

[3]The identification of HAROLD PERKINS in this Affidavit is based upon the following: First, CW1 has identified PERKINS. Second, law enforcement has been able to identify PERKINS's voice because that voice has been intercepted numerous times on Target Phones 1 and 2. PERKINS was identified or identified himself in many of those calls as

PERKINS that he/she would call him right back and then terminated the call. This call was not recorded.

16.    At approximately 2:49 p.m., CW1 placed a consensually recorded conference call (agents were the third party) to PERKINS at Target Phone 1. CW1 told PERKINS that he/she wanted "three of the same" (three ounces of crack cocaine, referring back to the same type of narcotics that CW1 had purchased from PERKINS on an earlier occasion). PERKINS confirmed that CW1 wanted two last time but wanted three this time. CW1 said that he/she would call PERKINS later.

17.    At approximately 4:56 p.m., CW1 placed another consensually recorded telephone call to PERKINS at Target Phone 1. CW1 asked PERKINS where he/she was supposed to meet PERKINS. PERKINS asked CW1 if CW1 was "grabbing that (completing the transaction for the three ounces of crack cocaine) as soon as you get over here?" CW1 asked if PERKINS wanted to hang out first and suggested that he/she would "grab that" later. PERKINS asked, "You want to grab it and just come back later, because I'm going to be working until later." PERKINS said, "I just got out here, so I'm gonna be busy for a couple hours." CW1 told PERKINS that he/she was coming up now. PERKINS told CW1 that he would be in the same place (as the last drug transaction) and told CW1 to call him when

---

"PERKINS." or with the alias names, "P" or "PERK." Third, during particular intercepted calls, PERKINS arranged to personally meet with other co-conspirators or CW1 and those meetings were surveilled by law enforcement. Finally, law enforcement officers have had in-person conversations with PERKINS during which PERKINS identified himself and those same officers were able to identify PERKINS in intercepted conversations.

CW1 got in the neighborhood. CW1 confirmed for agents that "the neighborhood" referred to the vicinity of the HEAD TO TOE located at 5005 North Clark Street.

18.     At approximately 5:04 p.m., agents searched CW1 and his/her vehicle for illegal drugs and to account for any money already in CW1's possession. No drugs were found on CW1 or in his/her vehicle. CW1 had $255 and was allowed to retain custody of $255. Agents equipped CW1 with a recording device and transmitter and provided CW1 with $2,500 to purchase crack cocaine.

19.     CW1, while under constant surveillance, proceeded toward the vicinity of 5005 North Clark Street. At approximately 5:35 p.m., CW1 placed a call to PERKINS at Target Phone 1. Only CW1's portion of this phone call was recorded. CW1 then called agents and related that PERKINS initially told CW1 to meet him in the vicinity of Montrose and Western, but CW1 pretended to not understand where that was. PERKINS told CW1 to go to Sherwin, the same location from a prior drug transaction.

20.     CW1 was observed continuously until he/she arrived at Sherwin, east of Sheridan. At approximately 5:55 p.m., CW1 placed a telephone call to PERKINS to tell PERKINS that he/she had arrived. CW1's side of this conversation was recorded. CW1 advised agents that PERKINS said he had to run into a building and would be there in approximately five minutes.

21.     At approximately 6:08 p.m., agents observed PERKINS enter the front passenger side of CW1's vehicle. PERKINS said, "Three (ounces of cocaine), right?"

According to CW1, PERKINS gave CW1 three plastic baggies containing an off-white rocky substance, and CW1 handed PERKINS the $2,500 previously provided by agents.  CW1 asked PERKINS to give him/her a deal and PERKINS said the deals come when CW1 buys four and one-half ounces.  PERKINS said, "When you buy a four and one-half, that is another ounce and a half."  PERKINS counted the $2,500 and told CW1 that CW1 only owed him $2,400.  PERKINS counted out $100 which he gave back to CW1.  PERKINS said, "If you grab a four and a half . . . ."  CW1 told PERKINS that he/she wanted a "strap," (According to CW1, this term is used for a firearm), and PERKINS told CW1 that CW1 did not want a pistol.  PERKINS said, "If they are going to rob you, they are going to rob you." PERKINS asked CW1 if CW1 was "doing weight" (selling large quantities of narcotics) and asked how much CW1 was selling.  (The term "weight" is commonly used by narcotics traffickers to refer to a large quantity of narcotics.)  CW1 said he/she was selling 20's, 50's, and 100's, like "eight balls" (one-eighth ounce quantity).  PERKINS said, "If you get the four and a split, bro, I'll get it to you for 32 so you're making a half ounce for free.  So you're saving a half ounce right there and you'll kill them on the half ounce."   (PERKINS previously charged $800 per ounce, so four ounces would cost $3,200.  I understand this to mean that CW1 would make a lot of profit on the additional half ounce.)  At approximately 6:10 p.m., PERKINS exited the vehicle.

22.    At approximately 6:11 p.m., CW1 left the vicinity of Sherwin and was observed continuously until he/she arrived at the predetermined meeting spot.    At

approximately 6:42 p.m., CW1 provided agents with three small plastic baggies containing an off-white rock-like substance, and identified the baggies as the material provided by PERKINS in exchange for $2,400 in buy funds. CW1 also provided the remaining $100 in buy funds. At approximately 6:46 p.m., agents deactivated the concealed recording devices and searched CW1 and his/her vehicle for contraband. No other contraband was found on CW1 or in the vehicle.

23. The substance was field tested and the result indicated the presence of cocaine. The laboratory analysis of the substance contained in the baggies indicated positive for cocaine base. The substance weighed 80.6 grams.

### May 22, 2006 Controlled Purchase from DURAN[4]

24. On May 22, 2006, at approximately 2:40 p.m., CW1 placed a consensually recorded telephone call to Target Phone 1. DURAN answered the phone. CW1 told DURAN that he/she talked to PERKINS and CW1 learned that it was alright to deal with DURAN. CW1 then asked for "an ounce hard" (an ounce of crack cocaine). When CW1 asked about the price, DURAN said that he will charge the same price as PERKINS. DURAN agreed to $700 for an ounce of crack cocaine. DURAN told CW1 to meet him at

---

[4]The identification of ROBERTO DURAN in this Affidavit is based upon the following: First, CW1 has identified DURAN. Second, law enforcement has been able to identify DURAN's voice because that voice has been intercepted numerous times on Target Phones 1 and 2. DURAN was identified or identified himself in many of those calls with the alias names "JOSE" or "BERTO." Third, during particular intercepted calls, DURAN arranged to personally meet with other co-conspirators or CW1 and those meetings were surveilled by law enforcement. Finally, law enforcement surveilled, stopped and identified DURAN following the June 8, 2006 controlled drug purchase by CW1.

his residence in the vicinity of West Granville Avenue and North Western Avenue. DURAN said that he is cool with PERKINS and CW1's cousin.

25.    At approximately 6:40 p.m., CW1 received an incoming call from DURAN that was consensually recorded.    DURAN asked when CW1 was going to be in the area.    CW1 told DURAN that he/she was on his/her way.    DURAN asked CW1 to meet him in the vicinity of West Summerdale Avenue and North Ashland Avenue. DURAN told CW1 to call him when he/she got to Foster Avenue.

26.    Immediately after the above telephone call, CW1 placed a consensually recorded telephone call to DURAN at Target Phone 1. DURAN stated that he was in a house located on the 1600 block (of Summerdale). DURAN asked CW1 if he/she wanted "hard" and CW1 replied yes. DURAN said that he would direct CW1 from Foster Avenue when CW1 called him.

27.    At approximately 6:50 p.m., agents searched CW1 and CW1's vehicle for illegal drugs and to account for any money already in CW1's possession and in CW1's vehicle.    No drugs or money were found on CW1 or in CW1's vehicle.    CW1 was then provided with $700 to purchase the crack cocaine.

28.    At approximately 6:58 p.m., agents equipped CW1 with recording devices and a transmitter.    CW1 then left the staging area for the vicinity of West Summerdale Avenue and North Ashland Avenue.    Surveillance observed CW1 continuously until he/she arrived in the vicinity of West Summerdale Avenue and North Ashland Avenue.

11

29.    According to CW1, on the way to the meeting location, CW1 called DURAN twice. DURAN told CW1 to make a left turn on Summerdale Avenue and meet him in the 2nd alley west of Ashland Avenue. CW1 also received a telephone call from DURAN, who wanted to know what kind of vehicle CW1 was driving. CW1 told DURAN that he/she was driving a Nissan Sentra. In these telephone calls, CW1's side of this conversation was recorded.

30.    According to CW1, when CW1 arrived in the alley, DURAN was waiting for CW1. DURAN identified himself as "BEE." DURAN got into CW1's vehicle and placed the drugs inside the middle console. CW1 handed DURAN the $700 in buy funds. DURAN asked if everything was there and CW1 said yes. DURAN exited the vehicle.

31.    At approximately 7:15 p.m., agents met CW1 at the predetermined meeting location and deactivated the concealed recording devices and the transmitter. Surveillance observed CW1 continuously en route to the predetermined meeting location. CW1 provided a small clear plastic bag containing yellowish rocky substance, suspected crack cocaine. Agents again searched CW1 and CW1's vehicle for illegal drugs and to account for any money found in CW1's possession. No drugs or money were found on CW1 or CW1's vehicle.

32.    The substance was field tested and the result indicated the presence of cocaine. Lab results were positive for cocaine base. The substance weighed 26.4 grams.

## June 8, 2006 Controlled Purchase from DURAN

33.    On June 8, 2006, at approximately 2:00 p.m., CW1 placed a consensually recorded telephone call, recorded by conference call with agents, to DURAN at Target Phone 1. CW1 asked DURAN if he could pick something up (referring to crack cocaine) and DURAN replied yes. CW1 told DURAN to meet him in the vicinity of Touhy Avenue and Central Avenue in Skokie, Illinois around 6:30 p.m. DURAN said he needed a half hour advance notice. DURAN said that he would sell the crack cocaine for the same price (on May 22, 2006, CW1 purchased one ounce of crack cocaine from DURAN for $700). When CW1 offered to pay $675, DURAN told CW1 that he/she would need to pick up the crack cocaine from him to get that price. DURAN said he was in the vicinity of Granville Avenue and Clark Street.

34.    At approximately 6:33 p.m., CW1 placed a consensually recorded telephone call to DURAN at Target Phone 1. CW1 told DURAN that he would be at Touhy and Central in 25 minutes. DURAN said it would take him one-half hour. CW1 told DURAN to meet him in the parking lot of MACARONI GRILLE restaurant. CW1 told DURAN that the restaurant is located in the vicinity of Touhy Avenue and Central Avenue in Skokie, Illinois. DURAN said that he would be driving a brown van.

35.    At approximately 6:45 p.m., agents searched CW1 and CW1's vehicle for illegal drugs and to account for any money already in CW1's possession and in CW1's vehicle. No drugs and money were found on CW1 or in CW1's vehicle. CW1 was then

13

provided with $700 to purchase the crack cocaine, and outfitted CW1 with concealed recording devices.

36.     At approximately 6:57 p.m., agents activated the transmitter and concealed recording devices. CW1 then left the staging area en route to the parking lot of MACARONI GRILLE restaurant, located at 7016 West Carpenter Road, Skokie, Illinois.     Agents maintained continuous surveillance on CW1 after CW1 left the staging area. Prior to leaving the staging area, CW1 initiated an unrecorded telephone call to DURAN in the presence of FBI agents. DURAN told CW1 that he would be at the meeting location in 10 minutes.

37.     At approximately 7:05 p.m., agents observed DURAN enter the parking lot of the VILLAGE CROSSING SHOPPING CENTER.

38.     At approximately 7:10 p.m., CW1 called DURAN and DURAN told CW1 that he did not see CW1 in the parking lot of the restaurant and he had been trying to call CW1. DURAN told CW1 to come to the parking lot of JEWEL grocery store (5667 West Touhy Avenue, Skokie, Illinois). CW1's side of this conversation was recorded.

39.     On the way to JEWEL grocery store, CW1 received a telephone call from DURAN. DURAN told CW1 to stay on the telephone. DURAN and CW1 decided to meet in the parking lot of OUTBACK STEAKHOUSE (5535 West Touhy Avenue, Skokie, Illinois). CW1's side of this conversation was recorded.

40.     At approximately 7:15 p.m., surveillance observed DURAN exit his vehicle and enter the front passenger side of CW1's vehicle. According to CW1, prior to entering CW1's vehicle, DURAN retrieved a small plastic bag containing yellowish rocky substance

14

from between DURAN's buttocks. CW1 told DURAN to place the plastic bag in the middle console. CW1 then counted the $700 and handed it to DURAN. DURAN said that he talks to PERKINS everyday. DURAN told CW1 to stop by the store. (Referring to HEAD TO TOE). DURAN told CW1 that PERKINS will be having a 4th of July party at PERKINS's house.

41.    At approximately 7:16 p.m., agents observed DURAN exit CW1's vehicle, and leave the OUTBACK STEAKHOUSE.

42.    At approximately 7:21 p.m., agents met CW1 at the predetermined meeting location and deactivated the concealed recording devices and the transmitter. CW1 was observed continuously en route to the predetermined meeting location. CW1 provided a small clear plastic bag containing a yellowish rocky substance, suspected crack cocaine, from the center console of CW1's vehicle. Agents searched CW1 and CW1's vehicle for illegal drugs and to account for any money found in CW1's possession. No drugs or money were found on CW1 or in CW1's vehicle.

43.    The substance was field tested and the result indicated the presence of cocaine. Lab results indicated that the substance was cocaine base and weighed 26.3 grams.

44.    Shortly after DURAN met with CW1, surveillance agents conducted an investigative stop on DURAN's vehicle. The driver of the vehicle was identified as ROBERTO DURAN and the passenger of the vehicle was identified as Individual B.

**B.    Telephone Intercepts and Corresponding Surveillance Observations**

**July 22, 2006 Purchase of Cocaine by MALDONADO from DURAN**
**and Seizure from MALDONADO of Cocaine**

45.    On July 22, 2006 at 9:04 p.m., MALDONADO called DURAN at Target Phone 1 from (847) 401-5163.[5] MALDONADO asked what was happening. DURAN told him to give him a minute, he was on his way to Fullerton, and he would be around in about an hour. MALDONADO said he was on Fullerton and Cicero himself. MALDONADO said he had "like seven dollars" ($700). MALDONADO asked how much DURAN was charging for the "whole zilla." DURAN said "for one (an ounce), it's only eight" ($800). MALDONADO said "for one it's eight right?" MALDONADO said he wanted seven (eightballs) and that he would "come at" Duran "for the whole zilla (ounce) on the next round."

46.    At 10:50 p.m., MALDONADO called DURAN at Target Phone 1 from (847) 401-5163. MALDONADO said he was on DURAN's block and that he saw DURAN.

47.    At 10:48 p.m., surveillance observed MALDONADO park a Jeep Grand Cherokee outside 1332 West Hood, exit the vehicle, and walk to the entrance of 1332 West Hood. MALDONADO met with an unknown male. MALDONADO returned to the Jeep and drove away.

---

[5]The identification of DAVID MALDONADO in this Affidavit is based upon the following: First, law enforcement has been able to identify MALDONADO's voice because that voice has been intercepted numerous times on Target Phone 1. Second, during particular intercepted calls, MALDONADO arranged to personally meet with other co-conspirators and those meetings were surveilled by law enforcement. Finally, law enforcement surveilled, stopped and identified MALDONADO following the July 22, 2006 drug purchase from DURAN.

16

48.    Law enforcement conducted an investigative stop on the Jeep at approximately 10:57 p.m. The driver of the vehicle was identified as DAVID MALDONADO. During the stop, law enforcement found a plastic baggie containing suspected crack cocaine on MALDONADO's person and retained the substance as evidence.

49.    The net weight of the seized cocaine was 23.2 grams and lab tests were positive for cocaine base.

50.    Based upon the above telephone intercepts and the observations of law enforcement personnel, I believe that MALDONADO purchased seven 1/8 oz quantities of crack cocaine from DURAN on July 22, 2006.

**September 11, 2006 Seizure of Cocaine and Firearms from WALLACE BUTCHER**

51.    On September 11, 2006 at 5:32 p.m., WALLACE BUTCHER called PERKINS at Target Phone 2 from (773) 209-3192.[6] PERKINS asked BUTCHER, "Did you ever go over there and finish that?" BUTCHER said no. PERKINS said "you know the situation that you're involved in right now and you're fucking jaggin off all day." PERKINS again asked where BUTCHER was and BUTCHER said he was by Wayne's World. PERKINS told BUTCHER to get out of there and drive around for two hours. PERKINS said when

---

[6]The identification of WALLACE BUTCHER in this Affidavit is based upon the following: First, law enforcement has been able to identify BUTCHER's voice because that voice has been intercepted numerous times on Target Phones 1 and 2. BUTCHER was identified or identified himself in many of those calls as "WALLY." Second, during particular intercepted calls, BUTCHER arranged to personally meet with other co-conspirators and those meetings were surveilled by law enforcement. Finally, law enforcement surveilled and stopped BUTCHER in conjunction with numerous telephone intercepts from Target Phone 2 on September 12, 2006 and BUTCHER identified himself.

BUTCHER came from court this morning, BUTCHER should have "gone over there and finished everything." PERKINS told BUTCHER, "you're gonna bring me down bro, for the rest of my fuckin life you're gonna take me down bro."

52.    At 6:44 p.m., PERKINS, using Target Phone 2, called BUTCHER at the same telephone number. PERKINS asked BUTCHER where he was and BUTCHER said "still on my detour." PERKINS told BUTCHER that he (BUTCHER) needed to get to it sooner or later. BUTCHER said he was jumping on it, that he had been up to Evanston and Skokie. PERKINS told BUTCHER to make sure the police weren't on him. BUTCHER said he was "on it." PERKINS told BUTCHER that BUTCHER should park in the alley. BUTCHER said he was thinking about parking a couple of blocks down. PERKINS told BUTCHER to park in the middle of the alley, walk to the beach and go around, "so they (police) don't know which way you went." PERKINS told BUTCHER to walk fast and not take his time being slow. PERKINS told BUTCHER to walk slow in the alley and walk faster once he got to the beach. PERKINS told BUTCHER to "make sure you get every fucking thing done for yourself. Only the people that are important. Think of all the people that you have and think of what you need ready for them for the next week. Get it all done, get everything out of there Wally, those toys and everything. The batteries, any batteries anything. Get it all out of there." PERKINS told BUTCHER that once BUTCHER got started, they were going to go in and empty out the "crib" (stash house). PERKINS told BUTCHER to throw everything out and get rid of everything.

53.    At 7:38 p.m., BUTCHER called PERKINS at Target Phone 2 from the same

telephone number. BUTCHER said "it's looking alright." PERKINS asked what he said, and

BUTCHER clarified that "everything seems to be alright." PERKINS asked if BUTCHER

found parking. BUTCHER said he parked where PERKINS told him too. PERKINS asked

if BUTCHER parked in front of a garage. BUTCHER said he parked right in front of the

building. PERKINS told BUTCHER to change clothes before he left, to put on a hat, and

to "grab a cab." BUTCHER said he would. PERKINS said he thought that they (the police)

were watching the neighborhood, but not for them. PERKINS told BUTCHER to "finish

everything" and to call him in 20 to 30 minutes.

54.    At 10:46 p.m., PERKINS, using Target Phone 2, called BUTCHER at the same

telephone number. PERKINS asked BUTCHER if he was done yet. BUTCHER said he

still had a couple of hours of work and was in the process. PERKINS told BUTCHER to

"take all those toys (guns) and everything out of there." BUTCHER said he already had them

and had the whole "plan and procedure." PERKINS told BUTCHER to make sure that he

changed and to call him before the taxi arrived.

55.    On September 12, 2006 at approximately 2:30 a.m., law enforcement

surveillance units, positioned outside 1211 West Jarvis, observed a white Flash taxi cab

parked in front of 1211 West Jarvis. Individual A exited the building and walked to the

parking lot of 1211 West Jarvis. Individual A looked around at the vehicles in the parking

lot and spoke with the driver of the Flash taxicab. BUTCHER then exited the east entrance

of 1211 West Jarvis with a black handbag over his shoulder. Individual A motioned to

BUTCHER to come to the cab. BUTCHER entered the taxicab. The FLASH taxicab then

drove westbound on Jarvis with BUTCHER as a passenger in the back. Individual A walked to the alley between Sherwin and Jarvis and entered the maroon Ford Windstar minivan and drove westbound in the alley. The FLASH taxicab drove southbound on Sheridan Road at a high rate of speed. The maroon Ford Windstar minivan followed behind the taxicab with Individual A driving.

56.    At approximately 2:40 a.m., an investigative stop was initiated on the Flash Cab by CPD officers. The passenger of the taxicab identified himself to an officer as BUTCHER. The black handbag was seized from the back of the taxicab and maintained as evidence. Inside the black handbag were five clear zippered bags containing crack cocaine and powder cocaine. The black handbag also contained three handguns with corresponding ammunition. Lab results indicated that the bags contained 353.5 grams of cocaine base and 541.6 grams of powder cocaine. The handguns included one Raven Arms, model MP25, .25 caliber pistol; one KelTec, model P11, 9mm caliber pistol; and a Colt, model Official Police, .38 caliber revolver.

57.    At 2:57 a.m., BUTCHER called PERKINS at Target Phone 2 from (773) 209-3192. BUTCHER told PERKINS that he needed to get out of there. PERKINS asked why. BUTCHER said that he hopped in a cab, the cab driver was driving, and they were pulled over by the "blue and whites (police cars)." BUTCHER said when the driver pulled over, the police rushed the car and yelled at him to get out of the car. BUTCHER said he had the bag right next to him, and the police pulled him out of the car. BUTCHER told PERKINS that the police "took the bag and broke (left) P (PERKINS)."

58.    Based upon the above telephone intercepts and observations of law enforcement surveillance units, I believe that PERKINS directed BUTCHER to retrieve the remainder of the cocaine held at the 1211 Jarvis address and cook into crack cocaine whatever amount of the cocaine BUTCHER needed to serve his customers' immediate needs. PERKINS further ordered BUTCHER to get all firearms and ammunition out of the apartment. BUTCHER then enlisted the help of Individual A, and the two went to the 1211 West Jarvis location to complete the task. Over the next several hours, BUTCHER then cooked powder cocaine into crack cocaine and divided the powder and crack cocaine into smaller portions in plastic baggies. BUTCHER and Individual A then devised a plan to try to remove the cocaine while avoiding detection of law enforcement. Individual A assisted in the transportation of the narcotics by acting as a lookout outside the apartment at 1211 West Jarvis and then drove in BUTCHER's van to act as a decoy for BUTCHER.

## VI.    CONCLUSION

59.    Based on the foregoing, there is probable cause to believe that HAROLD

PERKINS, ROBERTO DURAN, WALLACE BUTCHER, and DAVID MALDONADO

conspired with each other and others to knowingly and intentionally distribute and possess

with the intent to distribute controlled substances, namely, in excess of 50 grams of mixtures

containing cocaine base in the form of crack cocaine and in excess of 500 grams of mixtures

containing cocaine, Schedule II Narcotic Drug Controlled Substances, in violation of Title

21, United States Code, Section 841(a)(1), all in violation of Title 21, United States Code,

Section 846.


JASON RAHOY
Special Agent
Federal Bureau of Investigation


SUBSCRIBED AND SWORN TO BEFORE ME
this 18th day of March, 2008


HONORABLE ARLANDER KEYS
United States Magistrate Judge

22